UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
RUTH MYERS,

                        Plaintiff,                    **<u>MEMORANDUM & ORDER</u>**

      -against-                         16-CV-04567 (PKC)

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                         Defendant.
-----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

       Plaintiff Ruth Myers ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 19, 22.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmance of the denial of Plaintiff's claims. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Order.

## BACKGROUND

### I.    PROCEDURAL HISTORY

       On December 12, 2012, Plaintiff filed an application for DIB, claiming that she has been disabled since April 12, 2012, due to injuries she sustained when a step broke and she fell down a

---

      [1] Nancy A. Berryhill became Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as Defendant in this suit.

flight of stairs at work. These injuries caused Plaintiff to suffer severe back and leg pain, numbness, dizziness, and foot/leg weakness. (Tr. 10, 31, 99-100, 104, 152-59, 216.)[2] Plaintiff's DIB claim was initially denied on March 8, 2013. (Tr. 10, 60-67.) After her claim was denied, Plaintiff appeared for a hearing before Administrative Law Judge ("ALJ") April M. Wexler on November 18, 2014. (Tr. 26-48.) By decision dated December 2, 2014, ALJ Wexler found that Plaintiff was not disabled within the meaning of the Social Security Act at any time between April 12, 2012 and December 2, 2014. (Tr. 7-25.)[3]

After the SSA denied Plaintiff's application for review, Plaintiff filed an administrative appeal with the Appeals Council. (Tr. 6.) The Appeals Council denied review on July 25, 2016. Based upon this denial, Plaintiff filed this action on August 16, 2016, seeking reversal or remand of ALJ Wexler's December 2, 2014 decision.

## II. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate

---

[2] All references to "Tr." refer to the consecutively paginated Administrative Transcript. (Dkt. 7.)

[3] Generally, the ALJ considers whether the claimant was disabled through the date she last met the insured status requirements of Title II of the Social Security Act. In this case, however, Plaintiff met the insured status requirements until December 2, 2014. (Tr. 12.)

to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

## III.   ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

To receive DIB, claimants must be disabled within the meaning of the Act. Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all

necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v. Astrue*, No. 12 Civ. 432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, No. 09 Civ. 3957, 2011 WL 1304148, at *3 (E.D.N.Y. March 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera*, 697 F.3d at 151. First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment that considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four

to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise, the ALJ will proceed to step five, at which the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial, gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

## IV. RELEVANT FACTS AND MEDICAL RECORDS

Plaintiff's claim of disability stems from injuries she sustained on April 12, 2012, when she fell down a flight of stairs at work. Plaintiff alleges that the injuries caused her to suffer back and leg pain, numbness, dizziness, and foot/leg weakness. (Tr. 10, 31, 99-100, 104, 152-59, 216.)

### A. May 18, 2012 Magnetic Resonance Imaging ("MRI")

A magnetic resonance imaging ("MRI") performed on May 18, 2012 of Plaintiff's lumbar spine revealed a diffuse disc bulging[4] with superimposed left subarticular protruded disc herniation[5] at L4-5 and a diffuse disc bulge at L5-S1. (Tr. 212-13, repeated at 261-62, 422-23.)

---

[4] "A bulging disc, sometimes referred to as a slipped disc, is a degenerative spine condition". *Bulging Disc Diagnosis,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/articles/bulging_disc/receiving_diagnosis/587/ (last visited Mar. 23, 2018).

[5] A disc herniation, or herniated disc, refers to a condition where "a fissure develops in a disc's annulus fibrosus," (fibrous outer shell) and "some of the nucleus pulposus can pass through its compromised boundary. . . . Pain and other uncomfortable symptoms can develop if displaced inner disc material — which contains inflammatory proteins — irritates or pressures the disc wall, the spinal cord or a nearby nerve root." *Herniated Disc,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/herniated_disc/ (last visited Mar. 23, 2018).

### B. Medical Evidence from Treating Physician Dr. Jean Claude Compas

In July 2012, Plaintiff's treating doctor, Dr. Jean Claude Compas, prescribed a walking cane for Plaintiff, based on the results of the MRI. (Tr. 211.) Dr. Compas, who treated Plaintiff on a monthly basis from August 2012 to March 2013, repeatedly stated that Plaintiff's condition was guarded, that she was not able to resume her work activities (Tr. 210, 217 219-21), and that she could not sit for more than six hours, nor stand or walk for more than two hours, as required for sedentary work, noting evidence of a limited range of motion, spasm and tenderness in the paralumbar area, and limping or antalgic gait[6] (on July 12, 2012, Tr. 361-64; December 14, 2012, Tr. 345-48; repeated at Tr. 381-84; April 10, 2013, Tr. 307-10; September 19, 2013, Tr. 320-27; December 19, 2013, Tr. 407-10; February 21, 2014, Tr. 493-96; Sept. 9, 2014, Tr. 537-40.) Dr. Compas also stated in his Doctor's Progress Reports for Plaintiff's Worker's Compensation Claim that Plaintiff complained of constant "back pain, radiating to the left leg/buttock with decreased range of motion, muscle spasm, and a positive straight leg raising."[7] (Tr. 191-92.) As required by the Worker's Compensation Board, Dr. Compas filed additional reports for each treatment encounter with Plaintiff. (Tr. 193-209.) On July 13, 2012, Dr. Compas also prescribed a walking cane, physical therapy, and a trial of Ultracet and Voltaren gel for Plaintiff. (Tr. 21, 218, 244.)

---

[6] An antalgic gait is "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side." *See antalgic gait,* STEDMANS MEDICAL DICTIONARY 359070.

[7] A "positive straight leg raising" refers to a positive result on the "straight-leg raising test", which means **"**passive dorsiflexion of the foot in the supine patient with the knee and hip extended; back pain with this indicates nerve root compression or impingement." *See straight-leg raising test*, STEDMANS MEDICAL DICTIONARY 908450.

### C. 2012 MRI Review by Dr. Michelle Rubin, Board-Certified Neurologist

On October 6, 2012, Dr. Michelle Rubin, a board-certified neurologist, reviewed the May 18, 2012 MRI of the lumbar spine and diagnosed a left postlateral disc herniation at L4-5 superimposed on annular bulging resulting in a mass effect on the ventral thecal sac, especially the left, including the region of the emerging left L5 nerve root,[8] left foraminal encroachment,[9] an annular disc bulge at L5-S1, and lumbar scoliosis[10] and straightening, which could be related to muscle spasm/pain. (Tr. 343-44, repeats at Tr. 349-50.)

### D. Medical Evidence from Pain Management Specialist Dr. Conrad Cean

On October 4, November 29 and December 13, 2012, Dr. Conrad Cean administered several nerve root block injections on the right and the left of the spine, between L2-L3, L3-L4

---

[8] Thecal sac simply refers to "a membrane which surrounds the spinal cord and spinal nerves. It is filled with cerebral spinal fluid and acts as a protective barrier for sensitive nerve tissue." *Herniated Disc Impinging on the Thecal Sac*, THE HERNIATED DISC AUTHORITY, https://www.herniated-disc-pain.org/herniated-disc-impinging-on-the-thecal-sac.html (last visited Mar. 23, 2018).

[9] Foraminal encroachment refers to when "degeneration in the spinal column has caused an obstruction of the foramina, which are the open spaces on either side of the vertebrae through which spinal nerves pass on their way to other parts of the body. As these neural passageways become blocked, it can force pressure on the nerves, which causes pain at the site of the impinged nerve as well as symptoms that travel to the extremities." *Foraminal Encroachment,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/foraminal_stenosis/encroachment/ (last visited Mar. 23, 2018).

[10] Lumbar scoliosis refers to "an abnormal curvature of the spine within the five lumbar (lower back) vertebrae." *Lumbar Scoliosis,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/scoliosis/types/lumbar_scoliosis/ (last visited Mar. 23, 2018).

and L4-L5, and completed epiduriography[11] reports, finding no spinal stenosis[12], but diagnosing Plaintiff with lumbar radiculitis.[13] (Tr. 275-76, 278-79, 281-82, 288-90.) On January 3, 2013, Plaintiff returned to Dr. Cean, reporting pain with activities of daily living, walking, standing, and sitting for prolonged periods of time. (Tr. 365, 369.) She had limited relief with physical therapy. Dr. Cean added Tylenol #4 twice a day to her medication regimen; she received several lumbar facet joint injections, and reported zero reduction in her pain and continued to complain of left buttock pain. (*Id.*) Plaintiff was also anxious about her levels of pain. Dr. Cean advised that if she did not respond to the nerve root block injection, then he would propose spinal cord decompression. (*Id.*)

### E. Medical Evidence from SSA Consultative Physician, Dr. John Fkiaras

On February 25, 2013, Dr. John Fkiaras examined Plaintiff at the request of the SSA. (Tr. 292-94.) Plaintiff reported to Dr. Fkiaras that she had experienced lower back pain since an April 2012 work injury, that she had trouble walking, climbing stairs, standing, and lifting, and that sitting for a long period of time also exacerbated her low back pain. (*Id.*) Plaintiff reported using

---

[11] Epiduriography refers to a diagnostic test performed "to assess the structure of the epidural space" (the space around the dural, or hard matter) in the spine. "This procedure is done before epidural steroids are administered to ensure accurate delivery of the steroids to the source" of pain. *Diagnostic Epiduriography,* NY SPINE MEDICINE, http://www.nyspinemedicine.com/procedures/epidurography.php (last visited Mar. 23, 2018).

[12] Spinal stenosis refers to "the narrowing of the spinal canal that houses the spinal cord and nerve roots of the spine." *Spinal Stenosis*, LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/spinal_stenosis/ (last visited Mar. 23, 2018).

[13] Lumbar radiculitis or radiculopathy refers to "pain, tingling, numbness and/or weakness that travels, or radiates, along a compressed spinal cord or nerve root." *What is lumbar radiculopathy*, LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/radiculopathy/lumbar/ (last visited Mar. 23, 2018).

oral medications (Tramadol, Cyclobenzaprine, and Tylenol #4), but that they did not provide relief from pain, and Dr. Fkiaras noted that Plaintiff was to be scheduled for back surgery. (*Id.*) Dr. Fkiaras observed, upon examination, that Plaintiff was wearing a back brace and that her gait was antalgic with or without use of a cane, which Dr. Fkiaras observed was medically necessary for weight-bearing and balance. (*Id.*)

Dr. Fkiaras also observed that Plaintiff was able to rise from a chair without difficulty, but that she was unable to walk on her heels and toes, and that flexion of the lumbar spine was limited to 50 degrees. (Tr. 294.) Dr. Fkiaras found supine straight leg raising positive on the left at 50 degrees and seated straight leg raising was positive on the left at 60 degrees. He also found pain to the light touch on the bilateral lumbar region, and muscle strength 4/5 in the bilateral lower extremities. (*Id.*) Dr. Fkiaras diagnosed lower back pain, and opined that Plaintiff had a "marked" limitation for lifting, carrying, pushing, pulling, squatting, kneeling and crouching due to lower back pain. (*Id.*) Dr. Fkiaras further opined that Plaintiff had a "moderate" limitation for walking and a "moderate-to-marked" limitation for standing, bending, and climbing stairs. (*Id.*) Plaintiff was further directed by Dr. Fkiaras to avoid activities that would require sitting for extended periods of time. (*Id.*)

**F**. **Plaintiff's Evaluation by Neurosurgeon Dr. Ramesh Babu**

In April and May 2013, Dr. Compas referred Plaintiff to a neurosurgeon, Dr. Ramesh Babu, to evaluate Plaintiff's back disorder. (Tr. 263-64, 301-04, 312-13, repeats at Tr. 387-88, 413, 419, 424, 481-82.) A MRI performed on May 14, 2013 of the lumbar spine revealed a stable appearance

of the left paracentral[14] and foraminal disc protrusion[15] with minimal compression on the left subarticular recess with no appreciable mass effect on the nerve roots.  (Tr. 322-23, repeats at Tr. 425-26.)  The MRI also revealed a mild bilateral facet joint hypertrophy[16] at L4-5 and L5-S1, without spinal canal or foraminal stenosis,[17] and a shallow circumferential disc bulge at L5-S1. *Id.*

---

[14] A paracentral disc protrusion occurs when a spinal disc "bulge pushes near the center of the spinal canal, where it can pinch the spinal cord and nerve roots." *Paracentral disc protrusion,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/disc_protrusion/paracentral/ (last visited Mar. 23, 2018).

[15] A foraminal disc protrusion is "relatively easy to overlook as it does not impinge upon the spinal canal. Secondly as it does not narrow the subarticular recess[,] it compresses the exiting nerve root only… clinically mimicking a posterolateral disc at the level above." Dr. Ian Bickle and A. Prof Frank Gaillard, *et al., Foraminal disc protrusion,* RADIOPAEDIA, https://radiopaedia.org/articles/foraminal-disc-protrusion (last visited Mar. 23, 2018).

[16] Facet joint hypertrophy refers to "a condition in which the facet joints of the spine become enlarged." *Facet joint hypertrophy,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/facet_disease/articles/facet_joint_hypertrophy/ (last visited Mar. 23, 2018).

[17] Foraminal stenosis refers a narrowing of the open passageways between the spinal vertebrae, where they "are encroached upon by displaced bone or soft tissue, often due to degenerative changes in the spinal anatomy." *Foraminal stenosis overview,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/foraminal_stenosis/ (last visited Mar. 23, 2018).

### G. Lumbar Spinal Surgery Performed by Dr. Babu

On May 22, 2013, Dr. Ramesh Babu submitted documentation to support

authorization for a laminectomy,[18] facetectomy,[19] discectomy,[20] and spinal fusion.[21] (Tr. 297-300.)

On June 14, 2013, Dr. Compas summarized Plaintiff's complaints that she experienced "daily back

pain that radiates" to her left leg with decreased range of motion and antalgic gait. (Tr. 442, repeats

at Tr. 483.)  On July 1, 2013, Dr. Babu performed back surgery at New York University Hospital

won Plaintiff, with a left L4-5 and L5-S1 hemilaminectomy,[22] and an L4 to S1 posterolateral

---

[18] A laminectomy refers to "surgery that creates space by removing the lamina," which is "the back part of the vertebra that covers the spinal canal." *Laminectomy,* MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited Mar. 23, 2018).  Laminectomy is "generally used only when more-conservative treatments — such as medication, physical therapy or injections — have failed to relieve symptoms. Laminectomy may also be recommended if symptoms are severe or worsening dramatically." (*Id.*)

[19] A facetectomy refers to "an open back surgery designed to remove a portion of spine growth that results from facet disease and has impacted a nerve in the spinal column." *What is a Facetectomy?,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/articles/facetectomy_articles/ectomy/291/ (last visited Mar. 23, 2018).

[20] A discectomy refers to surgery that "will remove a portion of the herniated or bulging disc that is pressing on a nerve in the spinal cord." *What is a discectomy?,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/spinal_orthopedic_procedures/discectomy/ (last visited Mar. 23, 2018).

[21] Spinal fusion refers to "surgery to join two or more vertebrae into one single structure. The goal is to stop movement between the two bones and prevent back pain." *What Is Spinal Fusion?,* WEBMD, https://www.webmd.com/back-pain/spinal-fusion-facts#1 (last visited Mar. 23, 2018).

[22] A hemilaminectomy refers to a type of spine surgery to remove a small portion of the lamina, a part of a vertebra in the spine, "while still maintaining the stability and integrity of the spine." *What is a hemilaminectomy?,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/back_surgery/types/hemilaminectomy/ (last visited Mar. 23, 2018).

fusion.[23]  (Tr. 331-36, repeats at Tr. 341-42.)  On July 15 and August 15, 2013, Plaintiff reported severe back pain following the July 1, 2013 back surgery. (Tr. 314-17, repeats at Tr. 443, 445, 484-85.)  In July and August 2013, Plaintiff received home health aide services. (Tr. 318, 339-40.) Following Plaintiff's July 2013 back surgery, Dr. Babu prescribed a walker.[24] (Tr. 38, 329-30.)

### H. Post-Surgical Medical Evidence from Dr. Compas, and Dr. Matthew Lefkowitz, Pain Management Specialist

On September 19, 2013, Dr. Compas noted that Plaintiff reported chronic pain in her lower back which radiated to her legs. (Tr. 319, repeats at Tr. 444, 446, 486, 488.) Dr. Compas again completed a medical report form in which he stated that Plaintiff was not able to perform any type of work that required her to sit for six hours, or to stand or walk for two hours, as required for sedentary work, even with periodic alternation between sitting and standing to alleviate pain. (Tr. 324-27.)  On October 19 and 22, 2013, Dr. Compas completed a request for a three-pronged walker and another four weeks of home-attendant services for Plaintiff.  (Tr. 329-30, 338, 447, 487.)

On November 18, 2013, Plaintiff reported to Dr. Compas that she had been in another motor vehicle accident on October 26, 2013, and reported pain radiating down her left leg at a

---

[23] A posterolateral fusion refers to "a lumbar (lower back) spine surgery that is used to treat certain spine conditions, such as degenerative disc disease, spondylolisthesis and spinal stenosis", where "a bone graft is fused around a damaged disc, permanently attaching the two vertebrae surrounding the disc." *Posterolateral fusion,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/back_surgery/types/posterolateral/ (last visited Mar. 23, 2018).

[24] A "walker" is defined as a "light-weight 3-sided support structure" used by patients "with ambulation defects to help self-mobilizations", MCGRAW-HILL CONCISE DICTIONARY OF MODERN MEDICINE (2002) (retrieved March 23, 2018, from: https://medical-dictionary.thefreedictionary.com/walker).  A "walker" is also defined as a "light portable framework used for support and assistance in walking by a person with a gait impairment for which a cane or crutches are inadequate." MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING, (FARLEX 2012) (retrieved March 23, 2018, from: https://medical-dictionary.thefreedictionary.com/walker).

score of 10 out 10 (Tr. 449, repeats at Tr. 490.)  That same day, Dr. Compas issued a letter in which he opined that Plaintiff had been totally disabled since April 12, 2012 due to lumbar radiculitis and a herniated disc, noting that her prognosis was "guarded" and she was not able to resume her activities (Tr. 448, repeats at Tr. 489.)

On December 9, 2013, Dr. Compas completed another medical report in which he opined that Plaintiff could not carry more than ten pounds, and that she could not sit for six hours, nor stand or walk for two hours, as required for sedentary work, noting evidence of spasm, tenderness in the paralumbar area, and decreased range of motion post lumbar spine laminectomy. (Tr. 407-10.)

On December 19, 2013, Plaintiff complained to Dr. Compas that the Oxycodone prescribed to her worked for the pain, but "made her itchy". (Tr. 450-51, repeats at Tr. 491-92.)  Plaintiff reported significantly more pain in her left leg, with decreased strength and paresthesia.[25]  (*Id.*) Plaintiff also used a back brace and had difficulty sitting straight, and she reported difficulty in performing daily activities. (*Id.*) Dr. Compas recommended physical therapy, which Plaintiff received twice a week from December 2013 through February 2014. (Tr. 469-72.)  Dr. Compas noted Plaintiff reported interim, moderate improvement with physical therapy and medications on January 17, 2014 (Tr. 452-53), and but, ultimately, no improvement with physical therapy and medications on January 27, 2014 (Tr. 454-57.)

---

[25] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body", a feeling often described as feeling like "pins and needles", which happens when sustained pressure is placed on a nerve. *Paresthesia Information Page*, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited Mar. 23, 2018).

On February 21, 2014, Dr. Compas completed yet another medical form in which he opined that Plaintiff could sit for less than six total hours, stand and/or walk less than two hours, occasionally lift and/or carry less than ten pounds in an eight-hour workday, with periodic alternating between sitting and standing to alleviate pain. Dr. Compas again noted evidence of a limited range of motion and tenderness in the paralumbar area, as well as an antalgic gait. (Tr. 493-96.) On January 17 and February 24, 2014, Dr. Compas again noted that Plaintiff complained of severe pain radiating to the left leg, that she had difficulty getting up from a seated position and that she walked with a cane/walker. Dr. Compas certified that Plaintiff required a home attendant for four weeks. (Tr. 499-502, repeats at Tr. 506-07.)

On February 11, 2014, Dr. Mathew Lefkowitz performed a bilateral lumbar facet joint injection. (Tr. 549, repeats at Tr. 555.) On February 24, 2014, Dr. Lefkowitz performed a radiofrequency rhizotomy[26] of the medial branches of the left lumbar areas (Tr. 547, repeats at Tr. 553), and on March 17, 2014, Dr. Lefkowitz performed a radiofrequency ablation[27] of the right lumbar area. (Tr. 546, 548, repeats at Tr. 554.) On March 17, 2014, Dr. Compas noted that Plaintiff dragged her leg while using a walker, and advised that Plaintiff needed a home attendant for the next four weeks. (Tr. 497-98.)

---

[26] Radiofrequency ("RF") rhizotomy or neurotomy refers to "a therapeutic procedure designed to decrease and/or eliminate pain symptoms arising from degenerative facet joints within the spine. The procedure involves destroying the nerves that innervate the facet joints with highly localized heat generated with radiofrequency." *Radiofrequency (RF) Rhizotomy or Neurotomy*, NY SPINE MEDICINE, http://www.nyspinemedicine.com/procedures/radiofrequency-rhizotomy.php (last visited Mar. 23, 2018).

[27] Radiofrequency ablation (or "RFA") refers to a procedure used to reduce pain where "[a]n electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area." *Radiofrequency Ablation*, WEBMD, https://www.webmd.com/pain-management/radiofrequency-ablation#1 (last visited Mar. 23, 2018).

On April 21, May 16, and June 16, 2014, Plaintiff returned to Dr. Compas who repeatedly observed that Plaintiff had an antalgic, limping gait and walked with the aid of a three-pronged walker, that she used a back brace, and that she had decreased range of motion and muscle spasms. Dr. Compas also directed Plaintiff to continue to use a three-pronged walker. (Tr. 509-15.) On July 21, 2014, Dr. Compas examined Plaintiff, who reported that she was taking Oxycodone daily to cope with her pain; Dr. Compas again prescribed a three-pronged walker for Plaintiff. (Tr. 535-36.)

On September 4, 2014, Plaintiff reported to Dr. Compas that she was experiencing constant back pain, but that it was no longer radiating. (Tr. 516-19.) Dr. Compas opined that Plaintiff was totally incapacitated. (Tr. 520.) On September 9, 2014, Dr. Compas completed another medical form in which he reported that Plaintiff could sit for less than six total hours, stand and/or walk less than two hours, occasionally lift and/or carry less than ten pounds in an eight-hour workday. (Tr. 537-40.) Dr. Compas again noted evidence of a limited range of motion, spasm, and tenderness in the paralumbar area, and limping. (*Id.*)

## V. THE ALJ'S DECISION

The ALJ's decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. 10-19.) At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity between her alleged onset date (April 12, 2012) through the date of ALJ's decision (December 2, 2014). (Tr. 12.) At step two, the ALJ determined that Plaintiff suffered from lumbar degenerative disc disease, and post-surgical repair and depression disorder, which qualified as severe impairments. (*Id.*)

At step three, the ALJ determined that Plaintiff's impairments, either singly or in combination, did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (*Id.*) In reaching this determination, the ALJ focused on Listings 1.00 ("Musculoskeletal"), and 1.04 ("Disorders of the spine"), and found that Plaintiff's impairments did not meet the severity criteria in either listing because "no treating or examining physician has indicated findings that would satisfy the requirements of any listed impairment." (*Id.*) More specifically, the ALJ found that Plaintiff's impairments did not meet the severity criteria for 1.04, citing MRI scans of the lumbar spine performed in May of 2012 and May of 2013—both of which revealed diffuse bulging at L4-L5 with a superimposed disc herniation and bulging at L5-S1, with no evidence of foraminal narrowing, a protrusion at L4-L5 with minimal nerve root compression[28] and mild hypertrophy at L5-S1—and an EMG/NCV study[29] performed on March 26, 2013 which suggested no evidence of lumbosacral radiculopathy.[30] (Tr. 12-13, 15, 17.)

The ALJ therefore proceeded to determine Plaintiff's RFC, finding that Plaintiff was able to perform a range of sedentary work, with additional limitations noting that Plaintiff can

---

[28] Nerve root compression refers to "the impingement of a spinal nerve root by a condition in the spine." *Guide to nerve root compression,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/back_problems/compressed_nerve/resources/articles/what-is-nerve-root-compression/ (last visited Mar. 23, 2018).

[29] "NCV" refers to nerve conduction velocity study, a part of an "EMG", which "uses electrodes taped to the skin (surface electrodes) to measure the speed and strength of signals traveling between two or more points", often used to distinguish between a nerve disorder and a muscle disorder. "EMG" refers to electromyography, a procedure used to assess muscles and nerve cells that control them. *Electromyography (EMG),* MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 (last visited Mar. 23, 2018).

[30] Lumbosacral radiculopathy is a broad term that refers to "a range of symptoms associated with the nerves of the lumbosacral plexus in the lower back" which encompasses the nerves that exit the spinal cord at the lumbar region of the spine, and "occurs when an anatomical abnormality has caused one or more of these nerves to become irritated, pinched or impinged." *Lumbosacral Radiculopathy Definition,* LASER SPINE INSTITUTE, https://www.laserspineinstitute.com/learn_more/glossary/definition/lumbosacral_radiculopathy/155/ (last visited Mar. 23, 2018).

"occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, occasionally balance and stoop, [and] never kneel, crouch and crawl with an unlimited ability to push/pull", and that she has "the ability to perform simple, routine, repetitive tasks, low stress jobs, which means no work at fixed production rate pace, with work that is checked at the end of the workday or workweek rather than hourly or throughout the day." (Tr. 14.) In reaching this RFC determination, the ALJ accorded less weight, and also rejected, the medical opinions of the primary treating physician, Dr. Compas, finding that "[t]he opinions of Dr. Compas are partially consistent with the treatment records, which include clinical signs of musculoskeletal impairments", and that "the opinions offered [by Dr. Compas] are not supported by the EMG/NCV study, which suggested no evidence of lumbosacral radiculopathy . . . and the treatment record that frequently noted moderate improvement." (Tr. 16.) The ALJ further found that because Dr. Compas is a "family doctor and not a specialist in the field", the ALJ would only accord "some weight" to Dr. Compas's medical opinion. (*Id.*)

The ALJ further accorded limited weight to the medical evidence and opinion of Dr. Fkiaras, the physician who performed a consultative internal medicine examination at the request of the SSA, including his findings that the claimant "had marked limitations in lifting, carrying, pushing, pulling, squatting, kneeling, crouching," "moderate limitations in walking[,] and moderate to marked limitations in bending, climbing stairs and standing[,] and [that Plaintiff] should avoid activities that require sitting for extended periods". (*Id*.) The ALJ discounted these opinions because they were offered prior to Plaintiff's surgery, and the ALJ found them unsupported by subsequent records that "suggest[ed] moderate improvement." (*Id.*) The ALJ acknowledged that her determination of Plaintiff's RFC did not accord with Plaintiff's own

description of the intensity, persistence, and limiting effects of her symptoms, which the ALJ found was "not entirely credible." (Tr. 17.)

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work, as Plaintiff previously worked as a "Caretaker", an "unskilled job that requires a medium exertional capacity", which the ALJ acknowledged was greater than Plaintiff's exertional capacity. (*Id.*)

At step five, after determining Plaintiff's RFC, based on age, education, and work experience, and after consulting the vocational guidelines and a vocational expert, the ALJ determined that Plaintiff could make a successful adjustment to sedentary work existing in significant numbers in the national economy. (Tr. 18-19.) On that basis, the ALJ found that Plaintiff was not disabled from the alleged onset date (April 12, 2012) through the date of the ALJ's decision (December 2, 2014). (Tr. 19.)

## DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff argues that the ALJ erred by failing to afford proper weight to the opinions of Plaintiff's treating physician, Dr. Compas, and to the opinions of the SSA's own consultative examining physician, Dr. Fkiaras. (Pl.'s Br., Dkt. 23, at ECF 16-22.)[31] Second, Plaintiff maintains that the ALJ erred by substituting her own judgment for the opinions of the medical experts, including Dr. Fkiaras. (*Id.*) Third, Plaintiff argues that the ALJ erred, in her evaluation of Plaintiff's statements concerning the intensity, persistence, and functionally limiting effects of her symptoms, including failing to fully

---

[31] "ECF" refers to the pagination generated by the CM/ECF system, and not the document's internal pagination.

consider evidence that Plaintiff required a walker to ambulate. (Pl.'s Br., Dkt. 23, at ECF 16, 22-23.)

For the reasons stated below, the Court finds that the ALJ committed reversible error in failing to develop the record to properly determine Plaintiff's RFC and in evaluating Plaintiff's statements concerning the intensity, persistence, and functionally limiting effects of her symptoms. Furthermore, the Court finds that the ALJ's error in this regard is grounds for remand to further develop the record and issue a new decision, as explained more fully herein.[32]

## A. Plaintiff's RFC

First, the ALJ erred when she concluded that because the "claimant takes Gabapentin and reportedly gets physical therapy" and "only sees a primary care physician for her back impairment", Plaintiff's treatment was "fairly conservative" and the "diagnostic testing was relatively mild." (Tr. 17.) In concluding that Plaintiff's treatment for her pain was "conservative", the ALJ failed to consider that: (1) Plaintiff was prescribed, and took, Voltaren gel, Oxycodone, and Gabapentin, among other medications, for her pain (Tr. 21, 35-36, 180, 218, 450-51, repeats at Tr. 491-92; Tr. 535-36); (2) Plaintiff had to undergo spinal surgery and physical therapy from

---

[32] Because the Court reverses and remands on these grounds, the Court need not address Plaintiff's other arguments. However, on remand, the assigned ALJ should give appropriate consideration to the medical evidence regarding Plaintiff's ambulation issues in assessing whether her impairments meet the criteria of Listings 1.00 and 1.04. For example, in concluding that Plaintiff's impairments did not meet these listings, ALJ Wexler failed to adequately consider the substantial evidence establishing Plaintiff's inability to ambulate effectively. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §1.00, 1.00(B)(2)(b) ("[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without use of a walker."). Dr. Compas prescribed a cane for Plaintiff in July 2012. (Tr. 211.) In February 2013, Dr. Fkiaras confirmed that Plaintiff's use of a cane was medically necessary. (Tr. 293-94.) Following Plaintiff's July 2013 back surgery, Dr. Babu prescribed her a three-pronged walker. (Tr. 329-30.) Such evidence contradicts ALJ Wexler's determination that Plaintiff's need for a cane and/or walker to ambulate was "not well supported" by the record (Tr. 17), and indicates that Plaintiff's impairments may meet the criteria of Listings 1.00 and 1.04.

June through July 2013, requiring a home attendant for four weeks post-surgery (Tr. 331-36, repeats at Tr. 341-42; Tr. 318, 339-40); (3) Plaintiff again required a home attendant for eight weeks following surgery, and "still" had constant "chronic back pain" (Tr. 314-17, repeats at Tr. 443, 445, 484-85; Tr. 329-30, 338, 447, 487) (4) after Plaintiff's surgery, Dr. Lefkowitz performed a therapeutic bilateral lumbar facet joint injection (Tr. 549), radiofrequency rhizotomy of the medial branches of the left lumbar areas (Tr. 547), and radiofrequency ablation, none of which alleviated Plaintiff's pain (Tr. 365, 516-19) and (5) Drs. Lefkowitz and Compas observed no improvement in Plaintiff's pain level or ambulation following the surgery (Tr. 329-30, 338, 447, 487, 497-502, 509-15, 535-36, 552). Therefore, the ALJ's conclusion that Plaintiff's treatment was "fairly conservative" was not supported by substantial evidence. *Medick v. Colvin*, No. 16 Civ. 341, 2017 WL 886944, at *12 (N.D.N.Y. Mar. 6, 2017) (holding that ALJ's finding of "conservative" treatment was not supported by the record, where "the ALJ does not explain why plaintiff's course of medication . . . is considered conservative treatment, [and] there is no evidence that more aggressive treatment options were available or determined to be medically appropriate for plaintiff"); *see also Hamm v. Colvin*, No. 16 Civ. 936, 2017 WL 1322203, at *25 (S.D.N.Y. Mar. 29, 2017) (holding that ALJ erred in deeming plaintiff's treatment "conservative" where "the ALJ has pointed to nothing in the record to suggest that Plaintiff was an eligible candidate for more aggressive medical treatment, such as surgery").

The ALJ's approach in this case violated the basic rule that "[t]he ALJ is not permitted to substitute his [or her] own expertise or view of the medical proof for the treating physician's opinion" or a qualified expert. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). This is particularly true in light of the fact that the ALJ only gave the opinion of the treating physician, Dr. Compas, "some weight" because he "is a family doctor and not a specialist" and gave Dr.

Fkiaras's opinion "limited weight" because his opinion "was offered prior to the claimant's surgery and is not supported by subsequent records that suggest moderate improvement." (Tr. 16.) The ALJ could have sought another consultative examination for Plaintiff after her surgery to evaluate the nature of Plaintiff's treatment and pain symptoms, *see Burger v. Astrue*, 282 F. App'x 883, 885 (2d Cir. 2008) ("Indeed, the relevant regulations specifically authorize the ALJ to pay for a consultative examination where necessary to ensure a developed record.") (citing 20 C.F.R. § 404.1512(d)-(f)), but it was legal error for the ALJ to "make[] an RFC determination in the absence of supporting expert medical opinion". *Legall v. Colvin*, 13-CV-1426, 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10, 2014) (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)). Therefore, the case should be remanded for further development of the record.

### B. Plaintiff's Credibility

Second, the ALJ failed to properly evaluate Plaintiff's credibility. At the administrative hearing, Plaintiff testified about the pain and limitations caused by her claimed disability, including that:

- "70 percent of the day, your [H]onor, I'm laying in my bed. I'll get up and go to the bathroom, walk with my cane. And I'll walk to the kitchen, maybe to heat something up in the microwave. And that's my day. . . . I have to sit on the toilet and wash by the sink. I can't begin to shower anymore. . . . I can't make it without anything to hold onto. I have to walk with a cane, I have to walk with a walker." (Tr. 37-38.)

- "I have pain down my leg, like numbness, but the pain is mostly in my lower back. . . . [I]t's just numbness. It just constantly hurts. All day, every day. Like when I'm sitting right here; just boom, boom, boom. . . . All day, every day. I don't know what is this pain." (Tr. 43.)

- "Nothing helps me. Surgery has not helped it. Nothing is helping. I'm in pain constantly, every day, all day long." (Tr. 43-44.)

- "This has stopped my life. I can't go out dancing, I can't pick up things the way I used to. . . . My life is nothing now. I have to travel with this all the time. . . . I cannot walk alone without a walker." (*Id.*)

Additionally, the record is replete with Plaintiff's reports of her pain to her treating physicians. (*See* Tr. 31-32, 43-44, 152-54, 179-80, 191-94, 197-217, 244-47, 249-68, 273-74, 283-87, 292-95, 300-06, 312-17, 319, 322-27, 329-30, 337-40, 343-44, 352-53, 355-60, 365-72, 375-80, 385-86, 420-21, 422, 427-34, 439, 441-45, 449-57, 493-502, 512-19, 535-40.) Despite this evidence, the ALJ found that Plaintiff's statements concerning her pain, and the limitations caused by her pain, were "not entirely credible." (Tr. 17; *see also id.* ("While the claimant testified that she does very little at home and cannot walk without a cane or walker, her allegations of limitation are not well supported.").)

In fact, at the ALJ hearing, ALJ Wexler stated on the record that she felt that "the diagnostic testing [was] not matching up to [Plaintiff's] testimony." (Tr. 41.) However, the only bases for this negative credibility determination that the Court can ascertain from the ALJ's opinion are: (1) her finding of "fairly conservative" treatment (discussed *supra*) and (2) that "the claimant testified [at the ALJ hearing] that she receives some help with activities of daily living . . . [she] is able to prepare simple meals . . . [but] cannot get in the shower and cannot wash by the sink. Yet during the consultative examination, the claimant reported that . . . [she] cook[ed] daily, clean[ed] four times a week, [did] laundry once a week, shop[ped] three times a week, shower[ed] and dresse[d] daily." (Tr. 13.) ALJ Wexler ultimately concluded that "[b]ased on the entire record, *including the testimony of the claimant* . . . the evidence also establishes that the claimant retains the capacity to function adequately to perform many basic activities associated with work". (Tr. 17 (emphasis added).) This was error.

As an initial matter, the ALJ has an affirmative obligation to develop the administrative record. *Lamay*, 562 F.3d at 508-09. It was not proper for the ALJ to discredit Plaintiff's testimony regarding the limitations of her disability without asking Plaintiff to clarify the seeming

contradictions between her statements at the consultative examination and her testimony at the ALJ hearing. *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) ("A finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record. The failure to make credibility findings . . . fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support [the] conclusion that claimant is not under a disability.").

Further, under 20 C.F.R. § 404.1529, an ALJ must consider the Plaintiff's statements of the debilitating effects of her pain to the extent those statements are "reasonably . . . consistent with" all of the evidence. Beyond showing that a medical impairment could reasonably be expected to cause the symptoms of which the applicant complains—which Plaintiff showed in this case, according to the ALJ (Tr. 17)—an applicant has no burden to further "substantiate" or "support" her subjective statements of pain. *See Meadors v. Astrue,* 370 F. App'x 179, 184 (2d Cir. 2010) ("[The Claimant's] allegations [of the limiting effects of her symptoms] need not be substantiated by medical evidence, but simply consistent with it. The entire purpose of § 404.1529 is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." (quoting *Hogan v. Astrue*, 491 F. Supp. 2d 347, 353 (W.D.N.Y. 2007) (brackets omitted))); *Caffrey v. Astrue*, No. 06 Civ. 3982, 2009 WL 1953008, at *5 (S.D.N.Y. July 6, 2009) ("An adjudicator is expressly prohibited at this step from rejecting a claimant's allegations solely because objective medical evidence does not substantiate them.") (citing 20 C.F.R. § 404.1529(c)(2)).

The Court finds that, given Plaintiff's extensive testimony about her pain, and that the available medical evidence corroborates Plaintiff's subjective claims of pain, the ALJ erred in discounting Plaintiff's testimony. *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 271 (N.D.N.Y. 2009)

("[A]n individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone.") (citing SSR 96-7P); *cf. Cichocki,* 729 F.3d at 177 ("[W]here [the Court] is 'unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' we will not 'hesitate to remand for further findings or a clearer explanation for the decision.'") (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

*      *      *

In sum, the Court finds that the ALJ committed reversible error by: (1) failing to accord appropriate deference to the medical opinions of Plaintiff's treating physicians and the SSA's consulting physician; (2) substituting her own opinions for those of the qualified medical experts; and (3) improperly assessing the credibility of Plaintiff's statements regarding the pain and restrictions she experiences as a result of her claimed disability. The Court therefore remands this case for further proceedings consistent with this Order.

**CONCLUSION**

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*_____
PAMELA K. CHEN
United States District Judge

Dated:  March 23, 2018
        Brooklyn, New York